IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

FILED
U.S. DISTRICT COURT
BRUNSWICK DIV.

2007 MAR -7  A 11: 36

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | CASE NO.: CR205-37 |
| v. ) | |
| ) | |
| JOSE REYES VILLALOBOS ) | |
| ROMAN GUERRA ) | |
| JOSE VARGAS ) | |
| ANGEL MORFIN ) | |
| JOAQUIN MEJIA ) | |
| SUZANNA CARISOSA ) | |
| LAURA DAVENPORT ) | |
| BRIDGETTE REYNOLDS ) | |
| JEREMY THOMPSON ) | |
| ALMA MARIE WILLIAMS ) | |
| KATHERINE CRAPPS ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendant Jose Vargas ("Vargas") has been charged with conspiracy to distribute 5 kilograms or more of cocaine hydrochloride (powder) and 1000 kilograms or more of marijuana, in violation of 21 U.S.C. § 846, and aiding and abetting, in violation of 18 U.S.C. § 2. Vargas filed a Motion to Suppress evidence obtained as the result of searches of the vehicles he was driving on two (2) separate occasions. The Government filed a Response. On January 31, 2007, the undersigned conducted a hearing on this motion. Officers Hershel Wade ("Wade"), James Schuler ("Schuler"), and John Johnson ("Johnson") from Mississippi testified on behalf of the Government. Vargas testified on his own behalf with the assistance of an interpreter. Based on the following, Vargas' Motion to Suppress should be **DENIED**.

AO 72A
(Rev. 8/82)

## FINDINGS OF FACT

The credible evidence[1] before the Court establishes the following:

Vargas was traveling west in Mississippi on Interstate 20 on December 12, 2002. Officer Wade was driving approximately 70 miles per hour when he noticed Vargas' vehicle pulling away from him. Wade increased his speed to approximately 78-79 miles per hour and followed Vargas' vehicle. Vargas slowed down to approximately 60 miles per hour, crossed over the fog line onto the shoulder of the road, and corrected back to his lane of travel. Officer Wade initiated a traffic stop by turning on the blue lights in his vehicle, and Vargas pulled his vehicle to the side of the road. Officer Wade approached the driver's side of the car and saw Vargas, who is Hispanic, a small carry bag, and two (2) cell phones. Wade asked Vargas for his driver's license and proof of insurance. As Vargas gathered this information, Wade noticed Vargas' carotid artery was "pulsating" at an "accelerated" rate. (Doc. No. 194, p. 8.) Wade also noticed Vargas' hand was shaking and that he made brief eye contact when he gave him this documentation. Wade explained to Vargas that he stopped him because he was speeding and driving carelessly. Wade asked Vargas to get out of his vehicle and go to the front of his patrol car. Wade had the dispatcher check Vargas' driving history and status, and his license was valid. Wade issued verbal warnings for the traffic violations. Wade returned Vargas' license and proof of insurance to him, and Wade asked Vargas from where he was coming. Vargas stated he was driving from Atlanta to Dallas to visit his family for

---

[1] An evidentiary hearing was conducted on Vargas' Motion to Suppress so that the undersigned could make credibility determinations and develop the facts of this case. Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1211 (11th Cir. 2003). "Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002). As the fact finder at the evidentiary hearing, the undersigned had the opportunity to observe the witnesses and their demeanors and to hear their testimony. An officer's testimony was either uncontradicted or corroborated by another officer's or Vargas' testimony.

the holidays.[2]  Wade then asked Vargas if he had any open alcohol containers, weapons, marijuana, or cocaine in his car; Vargas responded "no" to each of these questions while making eye contact with Wade and shaking his head to indicate no. Wade also asked Vargas if there was a large amount of money in the vehicle, and Vargas said "no", broke eye contact with Wade, and looked toward the ground with a "nervous grin" while shaking his head no. At this point, Wade asked Vargas for permission to search his vehicle; Vargas said he could. The search of Vargas' vehicle revealed the presence of nearly $146,000 hidden in the vehicle's front rocker panel.

Vargas was traveling on Interstate 20 in Mississippi on September 8, 2003, when Officer Schuler stopped him for following too closely to an 18-wheeler. Schuler approached Vargas' vehicle and noticed Vargas had four (4) cowboy hat boxes but no luggage and one (1) key on his key ring. Schuler asked Vargas for his license. Vargas handed Schuler his license, and Schuler noticed Vargas' hand was shaking and that the carotid artery on the left side of his neck was pounding. Schuler tried to explain to Vargas why he had been stopped, but it seemed that Vargas did not understand English. Schuler went to his vehicle and called Officer Johnson, who had used translators in the past, to find a translator. While Schuler waited for Johnson to find a translator, Schuler ran Vargas' driver's license and information through the El Paso Information Center ("EPIC"); Schuler learned Vargas had been stopped by police on a previous occasion and a large amount of money had been found in a hidden compartment in his car. Officer Johnson arrived on the scene, and Vargas spoke to a

---

[2] During cross-examination, Wade testified that he did not know at the time he stopped Vargas that he was planning on staying in Dallas for the holidays.

translator over the phone after the translator[3] was told to ask Vargas from where he was coming, to where he was going, how long he was staying, and the purpose of the trip. Officer Johnson, who had completed a 40-hour course in Spanish, then asked Vargas if the officers could have his consent to search his vehicle. Vargas said "yes" in Spanish. Schuler crawled under the vehicle and noticed the underside of the vehicle was covered in mud except for the transfer case to the four-wheel drive. Schuler then crawled under the front of the vehicle and saw the front axle gear was cleaner than the rest of the underside. Schuler, through the translator, asked Vargas to follow the officers to the city's maintenance building. Once the officers and Vargas arrived, Schuler had his drug dog conduct an air sniff search of Vargas' vehicle. The dog alerted to the front bumper and the front quarter panels of the vehicle. Schuler searched the underside of the vehicle based on the dog's indication of contraband. Police recovered $45,689 hidden in the gear box of the vehicle.

## DISCUSSION AND CITATION TO AUTHORITY

Vargas asserts both traffic stops were unconstitutional, and, accordingly, the searches of his vehicles were unconstitutional as well. Vargas also asserts the evidence obtained as a result of these searches should not be admissible against him during the trial of this case.

The Government contends the traffic stops initiated by Officers Wade and Schuler were lawful because each of these officers witnessed Vargas violating the traffic laws of the State of Mississippi. The Government avers Officers Wade and

---

[3] Johnson testified the translator was a trustee at the Rankin County, Mississippi, Jail named "Jaime." The Court notes the officers used a translator to communicate with Vargas merely for informational purposes; there is no evidence before the Court which indicates the inmate-translator properly translated what the officers told him to ask Vargas or what Vargas told him to tell the officers.

Schuler had reasonable suspicion of criminal activity to detain Vargas for further investigation. The Government also avers Vargas lawfully consented to the searches of his vehicles.

**I.    The Traffic Stops**

"Law enforcement [officers] may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic . . . regulations relating to the operation of motor vehicles." United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998) (internal citation omitted). An individual officer's subjective intentions are irrelevant to the Fourth Amendment validity of a traffic stop that is justified objectively by probable cause to believe that a traffic violation has occurred. Whren v. United States, 517 U.S. 806, 810-13, 116 S. Ct. 1769, 1772-74, 135 L. Ed. 2d 89 (1996); Harrison v. State, 800 So. 2d 1134 (Miss. 2001). In other words, if the driver of a car has broken a traffic law, no matter how relatively minor, a motion to suppress evidence cannot be based on the argument that the stop was pretextual. See Whren, 517 U.S. at 809, 116 S. Ct. at 1772.

Wade testified that he stopped Vargas because he was traveling at least 78-79 miles per hour in an area having a 70 miles per hour speed limit and for careless driving after noticing Vargas' vehicle travel over the fog line. Accordingly, Wade had sufficient probable cause to stop Vargas, as he disobeyed two (2) traffic laws of the State of Mississippi. See MISS. CODE ANN. §§ 63-3-501 (general speeding provision) and 63-3-

1213 (careless or imprudent driving provision)[4]; Tran v. State, ___ So. 2d ___, 2006 WL 1320254 (May 16, 2006); Harrison, 800 So. 2d at 1134.

Schuler testified he stopped Vargas on September 8, 2003, because he was following too closely to the 18-wheeler traveling in front of him. Schuler had sufficient probable cause to stop Vargas, as he disobeyed a traffic law of the State of Mississippi. See MISS. CODE ANN. § 63-3-1213; Callahan v. State, 811 So. 2d 420 (Miss. App. 2001).

## II. The Officers' Reasonable Suspicion of Criminal Activity.

"The right of the people to be secure in their persons . . . and effects, against unreasonable searches and seizures, shall not be violated . . ." U.S. CONST. amend. IV. A seizure occurs "'whenever a police officer accosts an individual and restrains his freedom to walk away.'" United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S. Ct. 2574, 2578, 45 L. Ed. 2d 607 (1975)). At least "three separate categories of police-citizen encounters in determining which level of Fourth Amendment scrutiny to apply" have been identified by the Supreme Court: "(1) brief, consensual and non-coercive interactions" which do not implicate a Fourth Amendment analysis; "(2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied . . .; and (3) technical arrests, full-blown searches or custodial detentions that lead to a stricter form of Fourth Amendment scrutiny." Id. (internal citations omitted). The case *sub judice* involves the second type of encounters, and thus, requires analysis under Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

---

[4] The undersigned was unable to find specific provisions in the Mississippi Code concerning the traffic violations of careless driving and following too closely; thus, the undersigned cited the general "careless or imprudent driving" statute for these traffic offenses.

Terry requires that "an officer's investigation of a traffic stop . . . be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting Terry, 392 U.S. at 20, 88 S. Ct. at 1879)). Additionally, "the traffic stop must be of a limited duration. The stop 'may not last any longer than necessary to process the traffic violation unless there is' reasonable and 'articulable suspicion of other illegal activity.'" Id. (quoting United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001)).

Reasonable suspicion requires that the officer "'be able to point to specific and articulable facts which, taken together with reasonable inferences from those facts, reasonably warrant that intrusion.'" Boyce, 351 F.3d at 1107. The totality of the circumstances determines what reasonable suspicion is "such that, while some individual factors may be consistent with innocent travel[,] they can also, when taken together, give rise to a reasonable suspicion." Id. (internal citation and punctuation omitted). However, "reasonable suspicion must be more than an inchoate hunch, and the Fourth Amendment accordingly requires that police articulate some minimal, objective justification for an investigatory stop." Id.

### A.     The December 15, 2002, Stop.

Upon approaching Vargas' vehicle, Wade stated he noticed Vargas was Hispanic and had a small carry bag and two (2) cell phones in his vehicle. Wade also stated Vargas' hand was shaking and his carotid artery was "visibly pulsating at an accelerated rate." (Rep., p. 1.) Wade testified he returned Vargas' license and proof of insurance after finding out from the dispatcher that Vargas' license was valid; Wade issued Vargas verbal warnings rather than written citations for the traffic violations. Thereafter, Vargas

informed Wade he was traveling from Atlanta, Georgia, to Dallas, Texas, to spend Christmas with his family. Wade stated he then asked Vargas "several questions to . . . determine if there was any illegal activity in progress." (Id.) However, as Wade had already returned Vargas' license and proof of insurance and issued verbal warnings on the traffic violations, the traffic stop had concluded. Wade was permitted to extend the stop as he had a reasonable suspicion of criminal activity on Vargas' behalf at that time.

An officer may lengthen the detention of an individual to ask him questions unrelated to the initial reason the individual was stopped "if the initial detention has become a consensual encounter." United States v. Ramirez, ___ F.3d ___, 2007 WL 268898, *4 (Feb. 1, 2007). The Eleventh Circuit has not "directly addressed the question of when a Terry traffic stop shifts from a 'detention' to a 'consensual encounter.'" Id. at *5 (quoting United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999)). The Supreme Court "has held that a person being questioned by police is not seized 'if a reasonable person would feel free to terminate the encounter.'" Id. (quoting United States v. Drayton, 536 U.S. 194, 201, 122 S. Ct. 2105, 2110, 153 L. Ed. 2d 242 (2002)). In other words, if "a reasonable person would feel free to . . . terminate the encounter, the encounter with the police is consensual, and the Fourth Amendment is not implicated." Id. (internal citation and punctuation omitted). "This test 'is objective and presupposes an innocent person.'" Id. (quoting Drayton, 536 U.S. at 201, 122 S. Ct. at 2110). This test is examined under the totality of the circumstances presented in each case, including "whether there is any coerciveness on the part of the police, whether the exchange is cooperative in nature, and whether the defendant has

everything he reasonably required to proceed on his journey." Id. at *7; see also, United States v. Chrispin, 181 Fed. Appx. 935, 938 (11th Cir. 2006).

When Wade began asking Vargas questions unrelated to the initial traffic stop, Wade had returned to Vargas his license and insurance. Wade asked Vargas a "short series of questions" to which Vargas responded without hesitation. (Doc. No. 194, p. 10.)

There is no evidence before the Court that Wade coerced Vargas in any manner to answer the questions presented. At best, the evidence shows the blue lights on Wade's vehicle were on and Wade was wearing his uniform at the time; the undersigned would expect nothing less in this situation. Wade testified that Vargas was cooperative in answering his questions, and this testimony was not contradicted. Finally, Vargas' license and insurance had been returned to him, and accordingly, he had everything he needed to continue on his journey. An examination of the totality of the circumstances in this case reveals Wade's questioning of Vargas was a consensual encounter; therefore, the Fourth Amendment was not implicated. The undersigned recognizes Vargas' testimony that he felt he could not leave at the time until Wade told him he could. A reasonable person, however, would have felt free to leave after Wade returned his license and insurance, which concluded the traffic stop.

Having determined Wade's questioning of Vargas was permissible, the Court must now turn to the issue of the constitutionality of Vargas' consent to Wade's request to search his vehicle. Wade asked Vargas if he could search his vehicle (including the "inside, exterior, and any and all containers and luggage" (Doc. No. 194, p. 11)) after

asking Vargas the short series of questions. Vargas told Wade he could search the vehicle, and Vargas' answer was "prompt and responsive." (Doc. No. 194, p. 12.)

"A warrantless search is *per se* unreasonable under the Fourth Amendment unless it falls within one of several specifically established and well-delineated exceptions." Holmes v. Kucynda, 321 F.3d 1069, 1082 (11th Cir. 2003) (citing Mincey v. Arizona, 437 U.S. 385, 390, 98 S. Ct. 2408, 2412, 57 L. Ed. 2d 290 (1978)). An exception to the general rule against a warrantless search is a search made pursuant to consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-44, 36 L. Ed. 2d 854 (1973). Consent must be freely given, and the totality of the circumstances determines whether the consent was knowingly and voluntarily given. Ramirez-Chilel, 289 F.3d at 752-53. "In assessing [the] voluntariness" of a person's consent, "the inquiry is factual and depends on the totality of the circumstances." Purcell, 236 F.3d at 1281.

There is no evidence that Wade coerced Vargas in any way. In fact, even Vargas testified Wade had him sign a "paper where it was okay for [the officer] to search my vehicle", Wade tried to explain to him "he was going to check my vehicle", and that Wade "*asked*. . . if he could check my vehicle." (Doc. No. 194, pp. 74-75) (emphasis supplied). From the time Wade stopped Vargas until he asked for consent to search his vehicle, approximately 10 to 15 minutes elapsed. The duration of the traffic stop from its inception until the time Wade obtained Vargas' consent was certainly reasonable in light of Eleventh Circuit precedent. See, e.g., United States v. Hernandez, 418 F.3d 1206, 1211-12 (11th Cir. 2005) (noting a detention of seventeen minutes was justified based on the circumstances presented to the officer at the time of

the traffic stop). Vargas' consent to search his vehicle was freely given. Accordingly, evidence obtained as a result of this traffic stop and the resulting search should not be suppressed.

### B.     The September 8, 2003, Stop.

Schuler testified it seemed a short time after he stopped Vargas that Vargas did not speak English.[5] Schuler returned to his vehicle and called Johnson in an effort to find a translator so it could be explained to Vargas why he had been stopped. While he was in his vehicle, Schuler called Vargas' information in to EPIC and learned Vargas had been stopped on a previous occasion and a large sum of money was recovered from a hidden compartment in his vehicle. Schuler did not begin writing a citation to Vargas while he was in his vehicle, as he was awaiting Officer Johnson's arrival on the scene. Johnson arrived approximately five (5) minutes after Schuler contacted him, and Johnson told the translator what Schuler wanted to ask Vargas. Schuler's knowledge that Vargas had been stopped on a previous occasion and that a large amount of money had been recovered from a hidden compartment in his vehicle, when considered in light of Vargas having no luggage, having only one key on the key ring[6], Schuler noticing Vargas being "very nervous and stressed out", gave rise to Schuler's reasonable suspicion of criminal activity on Vargas' part. Schuler was permitted to exceed the scope of the traffic stop to investigate further his suspicion that Vargas was

---

[5] There is some question concerning Vargas' ability to speak English. For the undersigned's purposes, it seems sufficient that, at a minimum, Vargas understood the English words "license" and "insurance".

[6] Schuler testified the presence of only one (1) key being on a key ring, in his experience, meant the vehicle was not driven that often or the vehicle was borrowed for a trip. By itself, this factor seems innocent enough, but, when considered in combination with the other factors, it does not seem so innocent.

engaged in criminal activity. It was at this time Johnson asked Vargas in Spanish if the officers could search his vehicle. Vargas stated the officers could.

There is no evidence before the Court that Vargas' consent to search the vehicle was not freely given. From the time Schuler stopped Vargas until the time consent was obtained, approximately fifteen (15) minutes had elapsed. The duration of the stop was reasonable in light of Eleventh Circuit precedent, as noted above, and because Schuler had not written a citation at the time. Additionally, there is no evidence the officers coerced Vargas in an effort to obtain his consent.

During the search, Schuler looked underneath the vehicle and noticed areas which were not as dirty as the rest of the underside of the vehicle. Schuler testified that, based on his training and experience, individuals build compartments to hide drugs and money, and this is what the situation appeared to be to him. The translator was called again, and the translator asked Vargas to follow Schuler and Johnson to the city's maintenance building. It was there that over $45,000 was found in a hidden compartment of Vargas' vehicle.

This traffic stop and consent were lawful, and the evidence obtained thereafter should not be suppressed.

## CONCLUSION

Based on the foregoing, it is my **RECOMMENDATION** that Vargas' Motion to Suppress (Doc. No. 170) be **DENIED**.

**SO REPORTED** and **RECOMMENDED**, this 7th day of March, 2007.

_____
JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE